1   DAVID GROSSMAN (SBN 211326)
    dgrossman@loeb.com
2   ROBERT J. CATALANO (SBN 240654)
    rcatalano@loeb.com
3   LOEB & LOEB LLP
    10100 Santa Monica Boulevard, Suite 2200
4   Los Angeles, California 90067-4120
    Telephone:  310-282-2000
5   Facsimile:  310-282-2200

6   JONATHAN ZAVIN (Admitted *pro hac vice*)
    jzavin@loeb.com
7   LOEB & LOEB LLP
    345 Park Avenue
8   New York, New York  10154-1895
    Telephone:  212-407-4000
9   Facsimile:  212-407-4990

10  Attorneys for Defendants

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15  PAULA PETRELLA, an individual          )   Case No.  CV 09-0072 GW (MANx)
                                           )
16              Plaintiff,                 )   Assigned to the Hon. George H. Wu
                                           )
17          v.                             )
                                           )
18  METRO-GOLDWYN-MAYER, INC.,             )   **REPLY BRIEF IN SUPPORT OF**
    a corporation; METRO-GOLDWYN-          )   **DEFENDANTS' MOTION FOR**
19  MAYER STUDIOS, INC., a                 )   **SUMMARY JUDGMENT**
    corporation; METRO-GOLDWYN-            )
20  MAYER HOME ENTERTAINMENT,              )   [Defendants' Response To Statement Of
    LLC, a limited liability company;      )   Genuine Issues, Objections to Plaintiff's
21  METRO-GOLDWYN-MAYER HOME               )   Evidence, and Supplemental Declaration
    ENTERTAINMENT DISTRIBUTION             )   of David Grossman filed concurrently
22  CORPORATION, a corporation;            )   herewith]
    UNITED ARTISTS CORPORATION, a          )
23  corporation; 20TH CENTURY FOX          )   Date: October 22, 2009
    HOME ENTERTAINMENT, LLC, a             )   Time: 8:30 a.m.
24  limited liability company; and DOES 1  )   Courtroom: 10
    THROUGH 10, inclusive                  )
25                                         )
                Defendants.                )
26                                         )
                                           )
27  _____    )

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................1

II.   ARGUMENT ......................................................................................5

    A.   PLAINTIFF'S CLAIM FOR COPYRIGHT INFRINGMENT ............................................................5

        1.   Section 304(a)(4)(A) Of The Copyright Act Requires Dismissal Of Plaintiff's Infringement Claim ...............................................................5

        2.   Because The Book Is A Joint Work Of Authorship And Not A Derivative Work, LaMotta's Grant Of Rights In His Book Cannot Be Taken Away By Plaintiff ...............................................................6

        3.   There Is No Substantial Similarity Between The Works ...............................................................9

            a.   No Substantial Similarity Exists Between The Independent Elements Of The 1963 Screenplay And The Film ..............................................10

            b.   The Literary Works And The Film Are Not Substantially Similar ..............................................12

        4.   There Is No Admissible Evidence To Contradict The Joint Authors' Representations That The Book Is Original And That The Screenplays Are Based On The Book ...............................................................14

    B.   ALL OF PLAINTIFF'S CLAIMS ARE BARRED BY LACHES .......................................................20

        1.   Plaintiff's 18-Year Delay In Filing Suit Was Unreasonable ..............................................20

        2.   There Are No Facts To Dispute The Overwhelming Evidence Of Evidentiary And Expectations-Based Prejudice ...............................................................21

            a.   Evidentiary Prejudice Is Apparent In This Case ...............................................................21

            b.   Expectations-Based Prejudice ......................................23

    C.   PLAINTIFF'S CLAIMS FOR UNJUST ENRICHMENT AND ACCOUNTING MUST BE DISMISSED ...............................24

III.  CONCLUSION ...................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3  CASES

4  Benay v. Warner Bros. Ent., et al.,

5      No. 2:05-CV 08508 PSG (C.D. Cal. 2008) ........................................................13

6  Beyene v. Colman Securities Services, Inc.,

7      854 F.2d 1179 (9th Cir. 1988)..........................................................................14

8  Crane v. Poetic Products, Ltd.,

9      593 F.Supp.2d 585 (S.D.N.Y. 2009) ................................................................12

10  Danjaq LLC v. Sony Corp., et al.,
      263 F.3d 942 (9th Cir. 2001)..............................................................19, 21, 23

11
  Davis v. Blige,

12      419 F.Supp.2d 493 (S.D.N.Y.2005) ...................................................................7

13  De Acosta v. Brown,

14      146 F.2d 408 (2d Cir. 1944)..............................................................................12

15  Haas v. Leo Feist, Inc.,

16      234 F. 105 (S.D.N.Y.1916).........................................................................12, 21

17  Hal Roach Studios v. Richard Feiner & Co.,

18      896 F.2d 1542 (9th Cir. 1990)...........................................................................14

19  Hoehling v. Universal City Studios, Inc.,
      618 F.2d 972 (2d Cir. 1980)..............................................................................12

20
  Jackson v. Axton,

21      25 F.3d 884 (9th Cir. 1994)........................................................................19, 22

22
  Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,

23      456 F. Supp. 531 (S.D.N.Y. 1977)....................................................................20

24  Maitland v. Univ. of Minnesota,

25      43 F.3d 357 (8th Cir. 1994)...............................................................................15

26  Mappa Music Co. v. Universal-Polygram Int'l Pub.,

27      62 U.S.P.Q.2d 1582 (C.D. Cal. 2002) ..........................................................22-23

28

**Page(s)**

Narell v. Freeman,
  872 F.2d (9th Cir. 1989) ...................................................................9

Novak v. Warner Bros. Pictures LLC, et al.,
  No. 2:07-CV 07-4000 GAF at *3 (C.D. Cal. 2008)..........................................13

Russell v. Price,
  612 F.2d 1123 (9th Cir. 1979)................................................................9

Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.,
  221 F.2d 569 (2d Cir.), modified, 223 F.2d 252 (1955).......................................8

Shaw v. Lindheim,
  919 F.2d 1353 (9th Cir. 1990)...............................................................9

Tabachnik v. Dorsey,
  2005 WL 1668542 (S.D.N.Y. July 15, 2005) ..................................................12

STATUTES

17 U.S.C. §101 ............................................................................7

17 U.S.C. §304(a)(4)(A) .............................................................. 1, 4-5

1909 Copyright Act, §209...................................................................16

OTHER AUTHORITIES

1 Nimmer on Copyright § 6.03 (Matthew Bender, Rev. Ed.) .............................2, 7

1 Nimmer on Copyright § 6.05 (Matthew Bender, Rev. Ed.) .............................2, 6

1 Nimmer on Copyright § 6.12[C][3] (Matthew Bender, Rev. Ed.).......................25

2 Nimmer on Copyright § 9.06[F] (Matthew Bender, Rev. Ed.)...........................6

Moore's Federal Practice § 33.102[1] (3rd Ed. 2009) ...........................................10

# I.    INTRODUCTION

Faced with statutory language, case law and irrefutable evidence which establish Plaintiff's claims are legally and factually meritless and are based on a complete misunderstanding of copyright law, Plaintiff's Opposition attempts to selectively rewrite 40 years of conduct in a futile attempt to defeat Defendants' Motion.  Plaintiff's Opposition fails to address the key issues (or legal authority) cited in Defendants' Motion and, instead, relies on unsupported factual and legal theories that are contrary to Plaintiff's First Amended Complaint ("FAC"), her verified discovery responses, her sworn deposition testimony and documents executed by her father over 30 years ago.  Plaintiff erroneously argues that, due solely to her 1991 renewal of the 1963 Screenplay, legendary boxer Jake LaMotta has no interest in his own autobiography and she – and she alone – owns and controls the story about his life.  As if this were not enough, Plaintiff even goes so far as to assert that, notwithstanding the fact that she wants over $1 million in damages for alleged historical infringements, Defendants should be grateful that she intentionally and unjustifiably sat on her rights for almost 20 years while they incurred millions of dollars exploiting the Film.  In short, the Opposition only serves to further highlight the fatal deficiencies in Plaintiff's case.

- **Plaintiff's Claims Are Barred Under Section 304(a)(4)(A) Of The Copyright Act Because Plaintiff Failed To Timely File Renewal Copyright Registrations For Two Of The Three Literary Works**.

Plaintiff did not file timely renewal registrations for either the Book or the 1973 Screenplay and, to the extent that the Film is based on either of those works (if at all), Plaintiff cannot prevent the Defendants from continuing to distribute the Film.  This is a clear matter of copyright law and Plaintiff has not cited to any case law that contradicts the plain words of the Copyright Act.

Because Plaintiff failed to timely renew her father's copyright interest in the Book and the 1973 Screenplay, the Copyright Act unequivocally provides that

1  Defendants are entitled to continue to distribute the Film throughout the renewal

2  terms of those copyrights. Defendants' right to continue to exploit the expression

3  included in the Book is sufficient to defeat any copyright claim based on the use of

4  material included in the 1963 Screenplay because Plaintiff has not identified any

5  copyrightable expression that exists in the 1963 Screenplay, but not in the Book.

6        • **Plaintiff's Claims Are Barred Because LaMotta Is A Joint Author**

7          **Of The Book And Plaintiff's Ownership Of The 1963 Screenplay**

8          **Cannot Destroy LaMotta's Rights In His Own Autobiography**.

9      Plaintiff does not address the fact that the Book, whether created before or

10  after the 1963 Screenplay, **is a joint work of authorship**. Jake LaMotta, Joseph

11  Carter and Peter Petrella (under the pseudonym Peter Savage) jointly authored and

12  registered the Book. Plaintiff herself filed an untimely renewal registration

13  confirming that the Book was a joint work, co-authored by those three men. The

14  law is clear that each owner of a joint work possesses "an undivided ownership in

15  the entire work, including all of the contributions contained therein." 1 Nimmer §

16  6.03, at 6-5; 6:05, at 6-13 (explaining the **distinction** between joint works and

17  derivative works). Joint authors are each able to grant rights in the entire joint work

18  to a third party, with or without the consent of the other joint authors. Thus, Jake

19  LaMotta's valid and existing grant of the motion picture rights in the Book

20  constitutes a complete defense to Plaintiff's claims.

21      Plaintiff's unfounded speculation as to which of the works was created first is

22  irrelevant, because by joining together and creating (and registering) a joint work of

23  authorship, each author's contribution (whether pre-existing or not) became part of a

24  unified, and inseparable whole and each author retained the right to license or

25  transfer his interests in that joint work to a third party, subject only to his duty to

26  account to the other joint authors for any profits received by him. The Opposition

27  completely ignores the law of joint authorship. The reason for this is obvious – if

28  the Court were to accept Plaintiff's misleading argument that LaMotta's

autobiography is nothing more than a derivative work, rendering LaMotta, a joint author, unable to continue to exploit his own Book, this would eviscerate the law of joint authorship and would be completely unprecedented in copyright law.

- **There Is No Substantial Similarity Between The Works.**

Separate and apart from any published written works, Jake LaMotta assigned his "life story" rights to Defendants' predecessors-in-interest and therefore, any incidents, statements or characters from LaMotta's life obviously cannot be controlled by the Plaintiff.  There is simply no substantial similarity ***of protectable expression*** between the Literary Works and the Film.  That is because the only similarities between the Film and the Literary Works are some similar historic facts, and the common inclusion of historical facts about the personal life and boxing exploits of Jake LaMotta cannot serve as the basis for a claim for copyright infringement.  The proffering of "expert" testimony offering an opinion on similarity based on these historic facts cannot change the law.  Further, no expert testimony is needed or, indeed, even appropriate, for the Court to determine that historic facts are not protectable.  Moreover, in a case involving alleged substantial similarities of historic facts that was decided in this District last year, Plaintiff's expert, Lew Hunter, offered similar "expert" testimony regarding his conclusion that historic facts are protectable – and the Court rejected his testimony completely. Because the Literary Works and the Film are not substantially similar, Plaintiff's claims must be dismissed in their entirety.

- **Plaintiff's Claims Are Barred By Laches.**

Plaintiff's unreasonable and prejudicial delay of nearly twenty years in filing this action requires dismissal of this case under binding Ninth Circuit precedent. Plaintiff has provided no reasonable explanation for her intentional delay.

Plaintiff's attempt to create an issue of fact as to whether, contrary to all admissible written evidence, the Book was based on the 1963 Screenplay, highlights the evidentiary prejudice caused by this delay.  To the extent this fact could be

3

1  relevant (which Defendants deny), all witnesses with relevant, admissible,

2  information regarding the creation of the Literary Works have either passed away,

3  or, in the case of Mr. LaMotta, who is 88 years old, are, according to Plaintiff's own

4  testimony, likely no longer competent to testify.  Further, the Defendants have spent

5  millions of dollars in promoting, marketing and distributing the Film over the last

6  two decades and have entered into numerous agreements with third parties,

7  extending well into the next decade, based on their ownership of the Film.  The

8  Opposition argues that laches cannot be asserted in the case of a Film that has made

9  money during a plaintiff's period of unreasonable delay.  This assertion is

10  completely unsupported by the law.  In fact, the governing precedent in this circuit

11  clearly states that a plaintiff may not sit back and wait while a defendant spends

12  millions exploiting the work at issue, only to file a delayed suit seeking the benefit

13  of the years of effort poured into that work.

14        • **Plaintiff's State Law Claims Must Be Dismissed**.

15        Plaintiff has also alleged state-law claims for "unjust enrichment" and

16  "accounting."  The Opposition asserts that these claims are based on the theory that

17  Defendants and Plaintiff are "co-owners of the Book."  Contrary to this assertion,

18  Petrella and LaMotta, not Defendants, are the joint authors and co-owners of the

19  Book.  Plaintiff herself specifically admitted this in her Complaint.  FAC, ¶41

20  ("Plaintiff is the owner of all rights, titles and interest in…the Book, subject to Jake

21  LaMotta's divisible interest as a joint author.").

22        LaMotta and Petrella assigned motion picture, and other rights, to

23  Defendants' predecessors, but the authors retained publication rights, stage rights

24  and other rights in their jointly-authored Book.  As provided by copyright law, and

25  as discussed in the Motion, Defendants do not "own" the Book, and never did.

26  Plaintiff's "co-ownership" claims are therefore baseless, and must be dismissed.

27

28

1  **II.     ARGUMENT**

2     **A.     PLAINTIFF'S CLAIM FOR COPYRIGHT INFRINGMENT.**

3        **1.     Section 304(a)(4)(A) Of The Copyright Act Requires**

4           **Dismissal Of Plaintiff's Infringement Claim.**

5        The Opposition fails to address Section 304(a) of the Copyright Act which

6  provides that a renewal claimant must file a renewal application within one year

7  prior to the expiration of the initial 28-year term of copyright in order to preclude

8  distribution of derivative works (like a film) created during the initial period of

9  copyright.  17 U.S.C. §304(a)(4)(A).  With respect to the Book and the 1973

10  Screenplay, Plaintiff admits that she failed to renew these works.  UMF 27.

11        Plaintiff filed this case based on her assertion that she had properly renewed

12  her father's interests in all three Literary Works – the Book and the two underlying

13  Screenplays.  See FAC, ¶¶ 41-46.  Plaintiff alleged that "Defendants' copying, use,

14  modification, production, and distribution of elements of the 1963 Screenplay, 1973

15  Screenplay, and the Book, subject to Jake Lamotta's divisible interest as a joint

16  author…constitutes a violation of [the Copyright Act]."  Id., ¶46.  Plaintiff does not

17  understand or appreciate that her failure to timely renew the copyright registrations

18  in the Book and the 1973 Screenplay precludes her from being able to assert that the

19  Film, to the extent it is based on those works, is an infringing work.

20        The Copyright Act requires the filing of a _**timely**_ renewal registration in order

21  to preserve a renewal claimant's rights against the distributor of an allegedly

22  derivative work.  Thus, if a timely renewal registration is not filed, then "**a**

23  **derivative work prepared under authority of a grant of a transfer or license of**

24  **the copyright that is made before the expiration of the original term of**

25  **copyright may continue to be used** under the terms of the grant during the renewed

26  and extended term of copyright without infringing the copyright...."  17 U.S.C. §

27  304(a)(4)(A) (emphasis added).  Based on the express language of the Copyright

28

1  Act, and based on Plaintiff's failure to timely renew the copyrights in the Book and

2  1973 Screenplay, Defendants cannot be sued for any film based on those works.

3       There is no exception to this rule.  Plaintiff has not cited to any case law or

4  other authority providing that a party can nullify the effect of two valid grants via

5  the termination of a third, independent grant of rights.  Plaintiff's father, Petrella,

6  licensed his motion picture rights in the Book and the 1973 Screenplay and

7  Plaintiff's failure to timely file renewal applications with respect to those works

8  means that Petrella's grants remain valid (as do the grants from the other authors).

9  If this were not the case, a party could license his or her rights in a novel and a

10 manuscript to a third party.  Then, after the third party licensee creates a derivative

11 work (like a film) based on those two works, the original grantor could reveal a

12 third, but previously undisclosed "earlier" version of the novel and could sue for

13 infringement.  That is, in a nutshell, what Plaintiff is asking the Court to do here.

14 That is not the law – and because those grants remain valid, and neither Plaintiff,

15 nor her expert, has identified any protectable copyrightable elements of expression

16 that purportedly exist in only the 1963 Screenplay and the Film, Plaintiff's copyright

17 infringement claim must be dismissed.

18          **2.    Because The Book Is A Joint Work Of Authorship And Not**

19                 **A Derivative Work, LaMotta's Grant Of Rights In His Book**

20                 **Cannot Be Taken Away By Plaintiff.**

21       Plaintiff is simply wrong, as a matter unambiguous copyright law, that "the

22 Book itself is a derivative work…"  Opp. p. 11.  There is no question that the Book

23 was registered and published as **a joint work of authorship**.  UMF 2, Grossman

24 Decl., Ex. M.  Plaintiff is conflating the concepts of derivative works and joint

25 works.  See Nimmer, §6:05 (Alternatives to Joint Authorship: Derivative Works and

26 Collective Works) ("...in the case of both a derivative work and a collective work,

27 the contributing author owns only his own contribution, while in the case of a joint

28 work each contributing author owns an undivided interest in the combination of

1  contributions.  What, then, distinguishes a derivative work from a joint work based
2  upon inseparable parts?...The distinction lies in the intent of each contributing
3  author…").  Plaintiff intentionally ignores this distinction and incorrectly argues that
4  the jointly authored (and registered) Book is not a joint work, but rather, is a
5  derivative work which Petrella's heirs can now control at their whim.  This
6  argument is fundamentally flawed and, not surprisingly, Plaintiff does not provide
7  any authority or precedent to support her claim.[1]

8        There is no dispute that the copyright registration for the Book, which is
9  prima facie evidence of all facts included therein, states that the Book is a joint, and
10  original, work of authorship.  UMF 2.  The Book was also published as a joint work
11  (entitled "RAGING BULL: MY STORY" "by Jake LaMotta with Joseph Carter and
12  Peter Savage"), registered as a joint work, and Plaintiff herself renewed the Book as
13  a joint work.  UMF 1, 2; Grossman Decl., Exs. M, P; see also SGI 19.

14        Certain fundamental rights are granted to all joint authors when a joint work
15  is created.  Although there is no definition for a joint work in the 1909 Copyright
16  Act, the 1976 Act explains that a joint work is "a work prepared by two or more
17  authors with the intention that their contributions be merged into inseparable or
18  interdependent parts of a unitary whole."  17 U.S.C. §101.  The registration of a
19  work as a joint work of authorship "means that each contributor automatically
20  acquires an undivided ownership in the entire work, including all of the
21  contributions contained therein."  1 Nimmer §6.03; Davis v. Blige, 419 F.Supp.2d
22  493, 500 (S.D.N.Y.2005) ("a co-owner has a legal right to grant a license in a work
23  without another co-owner's permission or to transfer his rights in the copyright

24

25  _____
   [1] Defendants' counsel is unaware of any case after Abend that has held that, if an
26  author dies in the first term of copyright, the author's heirs can terminate the
   author's contribution to an inseparable joint work – and obviously any such decision
27  would run counter to the law of joint works.  Since this would fly in the face of the
28  law of joint authorship, the lack of such a case is hardly surprising.

1  freely. Absent an agreement to the contrary, one joint owner may ***always*** transfer his
2  interest in the work to a third party") (emphasis added).

3      Because each joint author owns the entire joint work, no one author can
4  preclude another from exploiting that work.  Thus, LaMotta, as a joint author of the
5  Book, retains all rights to license, assign, or otherwise exploit the Book for his own
6  benefit.  The only caveat being that LaMotta is bound, as a co-owner of a joint
7  work, to account to his other joint authors for any profits he receives from such
8  licenses.  Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569 (2d
9  Cir.), modified, 223 F.2d 252 (1955).

10      Because the Book is a joint work, Plaintiff's purported renewal of the 1963
11  Screenplay (assuming the 1963 Screenplay is deemed to pre-date the creation of the
12  Book) cannot effect the other joint authors' interest in the Book.  Plaintiff's father
13  joined with two other authors and created a joint work of authorship, which is
14  legally co-owned by each of the three authors.  Therefore, Plaintiff can never
15  preclude LaMotta from exercising his rights of joint authorship (or from licensing
16  others to use his joint work).  Because Defendants retain LaMotta's license to use
17  the joint work for purposes of creating a motion picture, the Film, even if it is
18  deemed to be based on the Book, is independently authorized by LaMotta's grant of
19  rights.  Plaintiff has no claim against Defendants – her only claim lies against
20  LaMotta to the extent he has profited from use of the Book and has not shared those
21  profits with Plaintiff.[2]

22

23  [2] The Literary Works were created under the 1909 Copyright Act and this issue is
    governed by that prior statute.  Under the 1909 Act, the courts even held that a joint
24  work could be created, thereby extinguishing a joint author's rights in any pre-
    existing works that were contributed to the newly-created joint work, whether or not
25  the authors of the pre-existing material had the specific intention of using their
    contributions to create the joint work at issue.  See Shapiro, 223 F.2d 252 (also
26  known as the "12th Street Rag" doctrine).  Thus, a lyricist could submit his lyrics to
27  a composer for purposes of developing a song and the composer could give those
    lyrics to his friend, who then created music to go with the lyrics.  The resulting song
28

1    The Opposition cites to <u>Russell v. Price</u>, 612 F.2d 1123, 1128 (9th Cir. 1979)

2  for the proposition that an owner of a stage play can prevent a third party from

3  distributing a derivative motion picture based on that play.  Opp. p. 12.  This

4  proposition is not in dispute in the present case.  In <u>Russell</u>, the author's stage play

5  was not a joint work.  That case only addressed the author's rights to prevent

6  unauthorized derivative works.  The question here is whether or not *a joint author*

7  can preclude his co-authors from continuing to exploit a co-owned joint work.  The

8  answer to this question is a resounding: No.  The law clearly distinguishes between

9  derivative works and joint works, a distinction completely ignored by Plaintiff.

10  Plaintiff, as heir to a co-author of a joint work, cannot deny any of the other co-

11  authors the right to license the use of their jointly-owned work.

12          **3.     There Is No Substantial Similarity Between The Works.**

13          Copyright law only protects an author's ***expression*** of facts and not the facts

14  themselves.  <u>Shaw v. Lindheim</u>, 919 F.2d 1353, 1356 (9th Cir. 1990) ("[c]opyright

15  law protects an author's expression; facts and ideas within a work are not

16  protected").  The Ninth Circuit has clearly held that: "[h]istorical facts and theories

17  may be copied, as long as the defendant does not 'bodily appropriate' the expression

18  of the plaintiff."  <u>Narell v. Freeman</u>, 872 F.2d at 910-911 (9th Cir. 1989).  Neither

19  Plaintiff, nor her purported expert, Mr. Hunter, have identified any copyrightable

20

21

22

23  _____

24  was deemed to be a joint work, even though the lyricist did not even know the other
   "joint author."  The 1976 Copyright Act clarified this issue, and states that, to create

25  a joint work, the co-authors must have the intent to join their contributions together
   to create a resulting unified work.  However, whether governed by the 1909 or 1976

26  Acts, the result here is the same, because there is no question that the joint authors
   of the Book intended to, and did, create a joint work, which was published and

27  registered by all three authors.  Once a joint work is created, under either statute, the

28  joint authors share full rights to exploit the resulting work.

1    expression, aside from the facts, characters, incidents and settings from LaMotta's

2    life itself, that are independently protectable.[3]

3            **a.    No Substantial Similarity Exists Between The**

4                    **Independent Elements Of The 1963 Screenplay And**

5                    **The Film.**

6            In discovery, Plaintiff was served with interrogatories requiring her to state

7    the basis for the claim that the Film and each of the Literary Works were similar.

8    Plaintiff provided detailed responses, spanning over 25 pages.  UMF 32-40;

9    Grossman Dec., Ex. H.  Now, in her Opposition, Plaintiff submits the declaration of

10   an expert, who she attempts to use to expand on her verified interrogatory

11   responses.[4]  Even if the additional, previously undisclosed testimony of Plaintiff's

12   expert were to be admitted under these circumstances, the alleged similarities

13   submitted by Mr. Hunter do not rise to the level of copying of protectable elements

14   of expression.

15           Plaintiff, and her expert, both rely on a chart created by Plaintiff listing the

16   common elements in the Literary Works and the Film.  Hunter Decl., ¶7(g) (Supp.

17   Grossman Decl., Ex. U).  In fact, Mr. Hunter appears to have reproduced Plaintiff's

18   chart and adopted it as his own "analysis."  Cf. Hunter Decl., pp. 5-18 with Supp.

19   _____

20   [3] Separately, LaMotta also granted motion picture rights to his "life story," including

21   but not limited to the right to use incidents, utterances and gestures from his life.
     Petrella Decl., Ex. 6, p.3a.

22   [4] Of course, this expert's testimony was known to Plaintiff many months ago and

23   was deliberately withheld by Plaintiff until after the filing of the Motion.  Plaintiff,
     in her deposition, admitted that she had asked Mr. Hunter to compare the Literary

24   Works to the Film, but her counsel instructed her not to answer any questions

25   relating to Mr. Hunter or the work he did.  Yet, in spite of the fact that Mr. Hunter
     clearly had performed a similarity analysis for Plaintiff, in her interrogatory

26   responses, Plaintiff did not include the analysis that Mr. Hunter now provides

27   relating to the alleged similarities between these works.  "A party answering
     interrogatories has an affirmative duty to furnish any and all information available to

28   the party."  Moore's Federal Practice § 33.102[1] (3rd Ed. 2009).

Grossman Decl., Ex. U.  The chart below shows the only elements Plaintiff claims exist in both the 1963 Screenplay and the Film – and that are not included in the other Literary Works.

| 1963 SCREENPLAY | FILM |
|---|---|
| Jake cries after he throws the fight to Billy Fox | Same. |
| Newspapers are thrown about Jake's home while Pete and Vickie try to comfort him | Jake throws newspapers on the kitchen table and argues with his brother Joey |
| Commentator in Jake's most famous comeback fight uses phrase "playing possum" [5] | Same. |
| After Jake wins the title he and Vickie are surrounded by reporters "among many popping flashbulbs" | At various fights and interviews, "popping and sizzling flashbulbs are used" |
| Use of "vignettes" of Jake and Vickie "acting it up for newsreels" and of Jake's courtship of his third wife, Sally | Use of "vignettes" of Jake and Vickie's courtship and wedding |

Hunter Decl., ¶18, Supp. Grossman Dec., Ex. U.  These alleged similarities are not copyrightable elements of expression.  Additionally, a review of the works themselves on these points reveals that the *expression* of these allegedly similar elements is far from similar – rendering these alleged similarities nothing more than common use of historical facts and scènes à faire.

---

[5] This is yet another example of an unprotectable historical fact.  Plaintiff's expert himself submits a biographical article about LaMotta that confirms that LaMotta was known for playing possum.  <u>See</u> Hunter Decl., Ex. 4 ("LaMotta was a clever boxer…He liked to play possum in the ring.").

1            **b.    The Literary Works And The Film Are Not**

2                        **Substantially Similar.**

3         Defendants retain complete motion picture rights to the Book, the 1973

4    Screenplay, and LaMotta's life story.  However, even assuming that were not the

5    case, the Film does not use protectable copyrightable elements from the Literary

6    Works, and such use is absolutely necessary for a copyright claim.[6]  The use of

7    common historic characters, settings, notable fights and personal conflicts are all

8    historical facts and cannot be the basis for a copyright claim.  The decision of

9    Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 978 (2d Cir. 1980) provides

10   that autobiographical works are only subject to the thinnest of protection, and that an

11   infringement claim will not lie unless two works depicting the same historical facts

12   are "virtually identical."  Plaintiff argues that Hoehling presents an "outer extreme"

13   of jurisprudence on this point and cites to Crane v. Poetic Products, Ltd., 593

14   F.Supp.2d 585 (S.D.N.Y. 2009).  However, Crane itself rejects a copyright claim

15   based on the historical fact doctrine and, in the process, repeatedly cites Hoehling

16   with approval.  Id. at 595 ("the only substantial similarity in selection, coordination,

17   and arrangement of expression between the two works is their timeline: both are

18   presented in roughly chronological order…The thin copyright protection afforded

19   by Feist to the selection, arrangement, and coordination of facts surely does not

20   extend to the presentation of historical events in the order in which they took

21   place.").  Crane also acknowledges that there is a litany of case law arriving at the

22   _____

23   [6] It is not enough that a work be "inspired by," or "based on," or share ideas with a
     prior work to state a valid copyright claim.  There must be copying of copyrightable

24   elements to maintain a copyright infringement action.  See Durham Indus., Inc. v.
     Tomy Corp., 630 F.3d 905, 912 (2d Cir. 1980) ("The only similarity of significance

25   in assessing claims of infringement is similarity of *expression.*" (emphasis in

26   original)); Sinicola v. Warner Bros., 948 F. Supp. 1176, 1190-91 (E.D.N.Y. 1996)

27   ("Thus, even if the Film were inspired by or adapted from the Novel, that would still
     not be sufficient for copyright infringement given the absence of substantial

28   similarity of copyrightable material in the works.").

1   same conclusion.  Id. at 591 (citing Tabachnik v. Dorsey, 2005 WL 1668542, at *5,

2   (S.D.N.Y. July 15, 2005) (presentation of the same historical facts in defendant's

3   book was not substantially similar to plaintiff's work because the defendant

4   presented those same facts in "his own distinct style and wording")).[7]

5         The Opposition also completely fails to even mention the two most recent

6   decisions of this Court on this very issue.  See Benay v. Warner Bros. Ent., et al.,

7   No. 2:05-CV 08508 PSG (C.D. Cal. 2008); Novak v. Warner Bros. Pictures LLC, et

8   al., No. 2:07-CV 07-4000 GAF at *3 (C.D. Cal. 2008) ("Though the two works tell

9   the story of the November 14, 1970 air plane crash, that event, and the events that

10  preceded and followed, are all matters of public record which cannot be

11  copyrighted.").

12        This Court hardly needs experts to determine that all of the similarities

13  asserted by Plaintiff are based on historic facts, which was, in fact, admitted by

14  Plaintiff herself in her deposition. UMF 36.  Further, Plaintiff's expert's opinion,

15  which is based on similarities in these historic facts (and, in fact, "opines" that,

16  contrary to established law, such facts should be protected), is completely unhelpful

17  to a copyright analysis of substantial similarity.  Plaintiff's expert acknowledges that

18  the facts and incidents from the Literary Works are widely accepted to be accurate –

19  and even attaches a news article that compares the Film to LaMotta's actual life and

20  concludes, in most major details, that the settings, characters and events from the

21  Film were based on historical fact.  See Hunter Decl., Ex. 1.  Hunter's unfounded

22  conclusion that similarities between the historic factual elements of the works at

23  issue can lead to a finding of substantial similarity is not only contrary to copyright

24

25  _____

    [7] Plaintiff's citation to De Acosta v. Brown, 146 F.2d 408 (2d Cir. 1944) is
26  inapposite.  De Acosta affirmed a judgment for the plaintiff when both works at
    issue involved historical *fiction* regarding the famous nurse, Clara Barton.  The
27  infringing work in that case appeared to copy fictionalized characters and scenes
    directly from Plaintiff's work.  Thus, this case has no relevance here.
28

1  law, **his assertion on this very same point was rejected by this Court last year in**

2  **the Benay case**.  Benay at *14.  The Benay court dismissed the plaintiff's claim

3  because "nearly all the similarities between the works arise from non-copyrightable

4  elements, such as historical facts and scènes à faire, 'which flow naturally from

5  generic plotlines.'"  The Court specifically rejected Hunter's testimony, wherein he

6  opined that the similarities at issue, even though they arose from historical facts,

7  could serve as the basis for a finding of substantial similarity.  Id.  ("even if the

8  Court were to accord Hunter's statement weight, Defendants have presented

9  evidence that the idea of a war officer from the West training the Imperial Army in

10 Japan is based on historical events").  The same conclusion must follow here.

11       Further, in her deposition, Plaintiff admitted, that, as far as she is aware,

12 virtually all of the facts, characters and incidents included in the Book and Literary

13 Works were taken from LaMotta's actual life.  See SGI 36 ("Q:…As far as you

14 know, are those characters and themes and circumstances based on the

15 circumstances, characters and themes from Jake LaMotta's actual life? A: Based on

16 them?  Yes, I'd say so.") (Grossman Decl., Ex. C, pp. 48:16 – 49:10; 55:7-14).

17       It is abundantly clear that there are no similarities of protectable expression

18 between the Film and Literary Works and summary judgment must be granted on all

19 of Plaintiff's claims.

20       **4.    There Is No Admissible Evidence To Contradict The Joint**

21            **Authors' Representations That The Book Is Original And**

22            **That The Screenplays Are Based On The Book.**

23       Although, as set forth above, it is irrelevant to all the legal defenses raised in

24 the Motion, Plaintiff attempts to create an issue of fact by arguing that the 1963

25 Screenplay was created before the jointly-authored Book.  However, Plaintiff cannot

26 attempt to create an issue of fact by the submission of inadmissible evidence.  Hal

27 Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1550-1551 (9th Cir. 1990)

28 ("A document which lacks a proper foundation to authenticate it cannot be

1  [considered on] a motion for summary judgment"); <u>Beyene v. Colman Securities</u>

2  <u>Services, Inc.</u>, 854 F.2d 1179, 1182 (9th Cir. 1988).

3      Not surprisingly, Plaintiff has no admissible evidence to support her newly-

4  minted theory that the Book and the 1973 Screenplay are "derivative works" of the

5  only work that was timely renewed – the 1963 Screenplay.  Plaintiff relies primarily

6  on the date of registration for the various works – but the date of registration is not

7  evidence of the date of **creation**.  An author can register a work whenever he or she

8  pleases, and, in the case of a book, it is common for such a work not to be registered

9  until a publishing deal is struck and the book is about to go into circulation.

10  Because there is no admissible evidence to prove Plaintiff's new theory, Plaintiff

11  has attempted to submit inadmissible hearsay (including the overwhelming majority

12  of her own declaration) in order to create an issue of fact regarding events that took

13  place forty to fifty years ago, including before she was born.  Of course, a public

14  figure often writes an autobiography (not a "screenplay") after his or her retirement.

15  LaMotta retired in the mid 1950's and it is clear from the evidence – which consists

16  of his statements, and those of Mr. Petrella, that the Book was the primary work

17  created about LaMotta's life that ***and it was not derived from any of the two***

18  ***Screenplays***.

19      Indeed, although it was finally published in 1970, there is virtually nothing in

20  the Book that discusses or chronicles any fact or event that took place after 1957.[8]

21

_____

22  [8] Plaintiff cites to the last two pages of the published version of the Book which

23  refers to, in "post-script" fashion, what LaMotta had been doing recently.  The first
    215 pages of the book describe facts and events that took place from 1930-1960 (the

24  penultimate chapter discusses LaMotta's 1957 incarceration in Florida – and the

25  final chapter makes a passing reference to his testimony before Congress in 1960).
    Thus, the overwhelming majority of the Book, save for a two-page epilogue,

26  concerns events that occurred ten years before the Book was published, and three

27  years before the 1963 Screenplay was allegedly written.  Therefore, Plaintiff's
    reference to these final post-script pages is not "evidence" that the remainder of the

28  Book was created after 1963.

1   Grossman Decl., Ex. J, pp. 1-214.  Regardless, the Court does not need to rely on

2   inferences drawn from the evidence because the authors of the Book, including

3   Plaintiff's father, unequivocally stated that the Book was the primary, original work

4   regarding LaMotta's life, and that the Screenplays copyrighted by Petrella were

5   based on the autobiographical Book.  Plaintiff should be estopped, as a threshold

6   matter, from contradicting her father's written contractual representations, because

7   she is his privy and is suing based on his alleged rights.  <u>Maitland v. Univ. of</u>

8   <u>Minnesota</u>, 43 F.3d 357, 363-364 (8th Cir. 1994) (under the doctrines of collateral

9   estoppel, equitable estoppel and promissory estoppel, "the party who is to be

10   estopped, or one in privity with that party, must have asserted a fact or claim, or

11   made a promise, that another party relied on…").

12        Aside from the arguments and inadmissible inferences included in the

13   Opposition, there is no credible evidence to contradict the following facts:

14       (a)    LaMotta and Petrella signed an agreement with Chartoff-Winkler

15       in 1976, whereby they transferred the motion picture rights in the Book

16       and the two Screenplays. <u>See</u> SGI, 8, Grossman Decl., Ex. A, p.1.

17       (b)    On the very first page of that agreement, LaMotta and Petrella

18       represent and agree that they are transferring motion picture rights in

19       the jointly-authored Book, and also "**in and to those certain**

20       **screenplays based on the said work [the Book]** which were written in

21       1963 and 1973…" (emphasis added)  <u>Id.</u>, Petrella Decl., Ex. 6, p.1.

22       (c)    On page 18 of that same agreement, LaMotta and Petrella

23       "represent and warrant that…**The [Book] is original and has not been**

24       **copied or adapted from any literary, dramatic or other work**." <u>Id.</u>

25       (emphasis added).

26       (d)    LaMotta and Petrella further represented and warranted that "the

27       Petrillo Screenplays [1963 and 1973] are original and have not been

28

1    copied or adapted from any literary, dramatic or other work **other than**

2    **the [Book]**." Id. (emphasis added).

3    (e)    The copyright registration for the Book states that it is an

4    original work of authorship and does not state that it is based on any

5    other registered work (as would have been required if it was based, as

6    Plaintiff suggests, on an earlier screenplay).  SGI 9.[9]

7    (f)    In 2008, when Plaintiff renewed the copyright in the jointly-

8    authored Book, she had a clear opportunity to assert that the Book was

9    a derivative work of the 1963 Screenplay – yet she failed to do so.  Her

10    renewal application renews the entire Book, acknowledges that it was

11    written by three co-authors (two of whom are now deceased) and does

12    not state that the Book is a "revision to a previously published work."

13    Grossman Decl., Ex. P.

14    In the face of this overwhelming documentary evidence, Plaintiff sets forth

15    two alleged "facts" she claims create a material dispute that must be tried by a jury.

16    The first is Plaintiff's assertion that, when she was four or five years old, in 1968 or

17    1969, she recalls her mother (who passed away in 2005) typing up handwritten notes

18    that her father had prepared.  Petrella Decl., ¶4.  Plaintiff believes these notes related

19    to Jake LaMotta.  The Opposition then makes several leaps of logic and concludes

20    that this "evidence" establishes that the Book was written after the 1963 Screenplay.

21    Of course, this testimony, aside from obvious problems of admissibility, credibility,

22    reliability and self-interest, does not create any genuine issue of fact as to when the

23

24    [9] The copyright registrations for the Literary Works are prima facie evidence of

25    every fact stated therein.  1909 Copyright Act, §209 (copyright "certificate[s] shall
      be admitted in any court as prima facie evidence of the facts stated therein.").  Thus,

26    these registrations establish that the Book is an original work and is not derived

27    from any previously registered work.  Plaintiff has not submitted any evidence to
      rebut this prima facie case of originality – and, in fact, Plaintiff herself filed the

28    2008 renewal registration confirming the originality of the Book.

1    Book was first created.  Plaintiff's testimony regarding her supposed observations

2    does not provide any admissible evidence as to what her father was actually writing

3    – or what her mother was typing (Plaintiff's mother typing up notes could have

4    involved polishing the earlier written Book, she could have been typing the 1973

5    Screenplay adaptation of the Book that Petrella registered shortly thereafter or it

6    could have been one of the "dummy" screenplays created by Petrella that Vikki

7    LaMotta refers to in her autobiography).  See Hunter Decl., Ex. 10, pp. 53, 57.

8        Plaintiff's second so-called "fact" is based on a document that was never

9    produced in discovery – and that was only sent to Defendants a few days before the

10   Opposition was filed.  Supp. Grossman Dec., ¶2.  Aside from being inadmissible

11   due to numerous violations of federal discovery rules, this document consists

12   entirely of unreliable and inadmissible hearsay.  Plaintiff submits what purports to

13   be a 1980 letter from someone named Martin Heller, to a man named Carl Erbey in

14   which Mr. Heller implies that he gave Petrella and LaMotta the idea to turn a

15   screenplay they had written into a book.  Id.  This document is of no evidentiary

16   value whatsoever and there is no way this letter could be shown to a jury.  There is

17   no evidence as to who either of these people are – and neither Plaintiff, nor her

18   father, nor any of the Defendants were copied on this letter.  This letter was not

19   created in the ordinary course of business by anyone, let alone Plaintiff.  It purports

20   to reminisce, in 1980, about a meeting that supposedly took place in 1969 and was

21   written for the apparent purpose of the author of the letter claiming personal credit.

22   The author is deceased, and this is entirely inadmissible hearsay.  Further, contrary

23   to Plaintiff's counsel's false statement about a stipulation regarding "admissibility"

24   of all the parties' documents, there is no such stipulation.  After receiving this letter,

25   Defendants immediately objected to its authenticity, conspicuous timing and

26   admissibility and, in no uncertain terms, explained that this document should be

27

28

1  excluded.  Id., Ex. T.[10]  The only credible and admissible evidence in the record

2  demonstrates that the Book is an original work of joint-authorship, and that the

3  Screenplays, including the 1963 Screenplay, were "based on" the Book.

4        There can be no genuine issue of fact regarding the veracity of the joint

5  authors' representations that the Screenplays were based on the Book because there

6  are no witnesses that can provide admissible evidence to rebut these clear

7  statements.  Mr. Petrella passed away in 1981.  Petrella Decl., ¶ 12.  Although

8  Plaintiff now claims that her mother assisted her father in typing up some portion of

9  the Literary Works, Plaintiff delayed filing this lawsuit for 18 years and, in the

10  interim, Plaintiff's mother passed away in 2005.  Id., ¶ 19.  The Book's other co-

11  author, Joseph Carter is also deceased, and Vicki LaMotta, Jake's wife during the

12  events in question, passed away in 2005.  Hunter Decl., Ex. 10.  And, according to

13  the New York State Bar, Mr. Heller, the supposed author of the 1980 letter, is also

14  deceased.  Supp. Grossman Decl., Ex. W.  Thus, Plaintiff's knowing, and

15  unreasonable delay has resulted in a situation where there is no way to try Plaintiff's

16  new theory of the case – the only people who could have provided admissible

17  testimony about this theory are either dead, or are no longer competent to testify.

18        Although Defendants prevail on all legal theories regardless of which of the

19  Literary Works was created first, the only admissible evidence in this case shows

20  that the Book is an original work, and is not derivative of any other work.

21

22  [10] The purported "stipulation" regarding authenticity cited to by Plaintiff's counsel is
23  nothing of the sort.  Plaintiff's counsel cites only to an exchange between counsel at
    a deposition in which the attorneys for the parties discussed the preparation of a
24  stipulation **in the future**, that would address the authenticity, not the admissibility,
25  of documents produced by the parties.  Supp. Grossman Dec., ¶¶2-5.  Notably, at the
    time this discussion (not agreement) took place, Plaintiff had not produced the
26  Heller letter, although required to do so by document requests served months before.
27  Finally, although a draft stipulation was prepared by Defendants (before the hearsay
    Heller letter was ever produced), Plaintiff's counsel promised to revise the draft and
28  provide comments, but never did.  Id.

**B.    ALL OF PLAINTIFF'S CLAIMS ARE BARRED BY LACHES.**

Plaintiff's claims are barred by laches.  See Danjaq LLC v. Sony Corp., et al., 263 F.3d 942, 947 (9th Cir. 2001).  To demonstrate laches, a defendant must prove (1) delay, (2) that the delay was unreasonable and (3) resulting prejudice.  Id. at 950-51.  Either of two forms of prejudice will support a finding of laches – evidentiary prejudice or expectations-based prejudice.  Id., at 955-56.  Further, prejudice is presumed in cases, such as this one, where the delay is nearly two decades.  Jackson v. Axton, 25 F.3d 884, 889 (9th Cir. 1994).

**1.    Plaintiff's 18-Year Delay In Filing Suit Was Unreasonable.**

Plaintiff does not dispute that she has worked in the entertainment industry for the last twenty years.  UMF 20.  Plaintiff also does not dispute that she, herself, read about the Supreme Court decision in Abend and consulted an attorney in 1990 or 1991 to investigate her rights.  UMF 21-22.  Nevertheless, Plaintiff did not file suit until 2009.

The Opposition asserts that "the reasons that the lawsuit was not filed sooner were largely due to a decision made by her mother and her mother and brother's poor health and a fear of reprisals by MGM…"  Petrella Decl., ¶16.  First, this is not a valid reason for an eighteen-year delay.  Second, based on Ms. Petrella's sworn deposition testimony, this new testimony is false.  Plaintiff testified that the she delayed filing suit between 1991 and 1998 because she did not believe that the Film was profitable.  UMF 26 (Grossman Decl., Ex. C, p. 65:1-24).  With respect to her further delay from 1998 through 2009, Plaintiff only testified that she had "weighed the risk of going forward with the claim [which Plaintiff explained meant the potential costs], and we felt we had put MGM on notice and they were assuming the risk…"  See UMF 23 (Grossman Decl., Ex. C, p.76:6-24).  Plaintiff does not mention, however, that MGM firmly rejected Plaintiff's assertions at that time and that Plaintiff decided not to file a claim, in spite of this express rejection.  Nowhere

1  in her deposition did Plaintiff testify that the health of her mother or her brother, or

2  any "fear of reprisals" from anyone prevented her from filing suit for eighteen years.

3  Implicitly acknowledging that the only reason for her delay was based on the

4  perceived financial status of the Film, Plaintiff cites to Lottie Joplin Thomas Trust v.

5  Crown Publishers, Inc., 456 F. Supp. 531, 534 (S.D.N.Y. 1977) and argues that it is

6  somehow reasonable to delay suit for twenty years while waiting for the

7  Defendants' distribution efforts to pay off.  Of course, this course of action is not

8  supported by the Lottie case.  In that case, the plaintiff was deemed to have

9  reasonably delayed in bringing suit because there was no infringing work being sold

10  to the public during the period of delay.  This case is a far cry from Lottie – Raging

11  Bull has been promoted, distributed and exploited nationally, and repeatedly, for the

12  last twenty years.  And Plaintiff was acutely aware of its wide distribution and her

13  alleged rights, at all relevant times.

14  Indeed, contrary to Plaintiff's unfounded assertions, for nearly a century,

15  courts, including the Ninth Circuit, have ruled that it is unreasonable, and

16  inequitable, for a claimant to wait and watch, filing suit only when the claimant

17  believes that the allegedly infringing work has become profitable.  See Danjaq, 263

18  F.3d 942, 951 ("[I]t is inequitable for the owner of a copyright, with full notice of an

19  intended infringement, to stand inactive while the proposed infringer spends large

20  sums of money in its exploitation, and to intervene only when his speculation has

21  proved a success. Delay under such circumstances allows the owner to speculate

22  without risk with the other's money…") (quoting Haas v. Leo Feist, Inc., 234 F.

23  105, 108 (S.D.N.Y.1916)).  Based on innumerable precedents, Plaintiff's delay of 18

24  years before filing the present suit was plainly unreasonable.

25  **2.  There Are No Facts To Dispute The Overwhelming Evidence**

26  **Of Evidentiary And Expectations-Based Prejudice.**

27  **a.  Evidentiary Prejudice Is Apparent In This Case.**

28

1    LaMotta, Petrella and Joseph Carter are the three primary witnesses that
2 would have been able to testify regarding the creation of the Literary Works at issue
3 in this case.  However, Carter and Petrella are deceased and Plaintiff, in her
4 deposition, testified that in 2005, she did not believe that Jake LaMotta was
5 competent any longer.  See Grossman Decl., Ex. C, pp.84:23-85:5 ("Q: **Do you**
6 **know whether or not he is -- he still has his faculties about him?  A:  I don't**
7 **think so**….Q: Did he in 2006, when you spoke to him? A: When I saw him in 2005,
8 he couldn't quite understand who I was, even though he saw me grow up.").
9 Indeed, this is not surprising as LaMotta is 88 years old now, having aged nearly
10 twenty years since Plaintiff first retained counsel relating to this claim and, even
11 assuming Plaintiff was incorrect about LaMotta's mental acuity, the issue of "fading
12 memories" is clearly applicable to witnesses in their late 80's, testifying about
13 activities that occurred thirty to fifty years ago.  Jackson, 25 F.3d at 890.

14    Additionally, Plaintiff's mother, who presumably, and according to Plaintiff
15 herself, was a witness to the creation of some of the Literary Works, passed away in
16 2005, fourteen years into Plaintiff's delay in bringing this case.  Petrella Decl., ¶19.
17 Further, Vikki LaMotta, Jake's former wife during the events in question, could also
18 have provided relevant testimony, yet she also passed away in 2005, during the
19 second decade of Plaintiff's unreasonable delay.  Hunter Decl., Ex. 5.

20    Plaintiff now seeks to contradict clear written statements made by Jake
21 LaMotta and her own father.  SGI 11 (asserting that the statements made by
22 LaMotta, Carter and Petrella regarding the fact that the Book is original and that the
23 two Screenplays were based on the Book may have been "wrong").  No such issue
24 of fact could ever be resolved in 2009 because there are no witnesses available to
25 resolve the issue Plaintiff attempts to create.  There could not be a clearer instance
26 of evidentiary prejudice caused by delay.

27
28

### b.    Expectations-Based Prejudice.

Expectations-based prejudice includes circumstances in which the defendant has licensed the work to third parties based on the presumption of ownership resulting from an unreasonable period of delay.  Jackson, 25 F.3d at 890 (finding prejudice after delay of between 18 and 22 years when "numerous business transactions have been made in reliance on Axton's sole ownership of the Song."); Mappa Music Co. v. Universal-Polygram Int'l Pub., 62 U.S.P.Q.2d 1582, 1587 (C.D. Cal. 2002) (prejudice found where defendants and third parties engaged in numerous and recent business dealings involving the song).

Plaintiff, in her Opposition, asserts a unique, and easily debunked, theory regarding a so-called lack of prejudice on the part of the Defendants.  The Defendants have spent millions of dollars investing in the marketing, distribution and production of Raging Bull.  UMF 28-29, 42-45.  Plaintiffs do not attempt to dispute either the existence or amount of these expenditures.  Id.  Further, Plaintiffs do not, and cannot, dispute that Defendants have converted the Film to various formats, including VHS, laser disc and DVD.  UMF 42, 45.  Plaintiffs also concede that, as recently as 2005, Defendants created a special 25th Anniversary edition of the Film and at the end of 2008, Defendants converted the Film to Blu-ray.  Id.  Finally, Plaintiffs cannot dispute that Defendants have arranged their affairs based on their ownership of the Film and have licensed the Film to third parties over the course of the last two decades, as well as into the future.  UMF 41, 43-44, 46-47.  Instead of attempting to dispute the existence of these facts, Plaintiff argues that her unreasonable 18-year delay did not cause any prejudice to Defendants because the Film has made more money than it has lost over the last several years.  Opp., p. 19.  In essence, Plaintiff's theory is that, if a defendant spends millions of dollars promoting, advertising and distributing a work, and then receives positive cash flow based on all of its work and planning, then no prejudice exists.  Id.  This is not a correct statement of the law and is entirely inconsistent with Danjaq.  In Danjaq, the

1  Ninth Circuit held that the plaintiff's unreasonable delay of 17 to 36 years (differing

2  for the various works at issue) was prejudicial because the defendants had spent

3  millions in marketing promoting and distributing the works at issue during the

4  period of the plaintiff's delay.  263 F.3d. 956.  There is simply no exception to the

5  doctrine of laches for cases in which the work at issue is profitable – and, indeed,

6  the <u>Danjaq</u> case itself involved the highly successful James Bond franchise.

7        Finally, Plaintiff's theory falls flat because the Opposition neglects to point

8  out that **<u>Plaintiff seeks to recover from Defendants' in excess of $1 million in</u>**

9  **<u>damages from exploitation of the Film</u>**.  <u>See</u> FAC ¶49.  Thus, Plaintiff argues that

10  the Defendants have benefited from their exploitation of the work over the past

11  decade or so, but Plaintiff fails to point out that she is seeking to erase that income –

12  and to interfere with Defendants' existing contracts and license agreements by

13  enjoining further distribution of the Film.  FAC, p. 11.  Thus, the "benefit" argument

14  is a red herring – in actuality, Plaintiff seeks to cause severe prejudice to Defendants

15  by erasing the years of work and value Defendants have put into the Film.

16      **C.**    **PLAINTIFF'S CLAIMS FOR UNJUST ENRICHMENT AND**

17          **ACCOUNTING MUST BE DISMISSED.**

18        Plaintiff's state law claims for unjust enrichment and accounting are premised

19  on the assertion that Defendants and Plaintiff are "co-owners" of the Book.  This

20  claim is unintelligible.  Plaintiff does not assert which of the Defendants allegedly

21  "own" the Book and there is no legal theory by which any of the various Defendants

22  could be deemed to "own" Jake LaMotta's autobiography.  As discussed in detail

23  above, the Book is a joint work of authorship, owned by the three original co-

24  authors (or their heirs).  Any income received by the joint authors from exploitation

25  of their joint work – such as by granting motion picture rights in their work to

26  Defendants, must be shared with all co-authors.  But the grant of motion picture

27  rights to a third party does not cause that party to become another "joint owner" for

28  purposes of copyright law.  Again, Plaintiff simply confuses the distinction between

a joint work and a derivative work. The Film, if it is based on the Book, would merely be a derivative work, and the owner of a derivative work does not need to "account" to co-owners of the underlying work.

Plaintiff claims that Defendants' counsel previously asserted that "Plaintiffs and Defendants are co-owners <u>of the motion picture rights</u> to the published book." Opp., p. 22 (emphasis added). Defendant then concludes with a non-sequitor – that this must mean that Plaintiff and Defendants are co-owners of <u>the Book</u>. This is nonsense. If LaMotta granted motion picture rights to Defendants (and he did) and Petrella did not, the parties would be in the same position that they are now, having equal rights to exploit the motion picture rights in the Book. Notably, Petrella, LaMotta and Carter reserved their publication rights, stage rights and other non-film rights in the Book in connection with the 1976 Agreement. Petrella Decl., Ex. 6 (pp. 1-7). This limited grant of rights confirms that the joint authors of the Book remain so. <u>See</u> Nimmer, § 6.12[C][3] (when joint authors join in a grant of film rights, the film maker "is not a joint owner of 'the copyright' in the [underlying] work...") As such, there is no obligation by Defendants to "account" to Plaintiff as a joint owner of the Book. <u>Id.</u>

Any "accounting" remedy relating to the exploitation of the Book must be asserted against LaMotta, and not against any third party licensed to exploit the motion picture rights in the Book.

## III.    CONCLUSION

For all of the foregoing reasons, Defendants respectfully submit that summary judgment be granted.

Dated:  October 15, 2009          LOEB & LOEB LLP
                                  JONATHAN ZAVIN
                                  DAVID GROSSMAN
                                  ROBERT J. CATALANO


                                  By:  <u>/s/ David Grossman</u>
                                       David Grossman
                                       Attorneys for Defendants